Her argument this morning is Comsys against Pacelli. Mr. Bright. May it please the court. Remzi Bitar for the three City of Kenosha officials who have taken this appeal. This case involves the termination of a contract between a municipality and its vendor. The alder persons sitting on the City Council who cast their vote to terminate the contract which was terminable at will with or without cause for any reason whatsoever have been found to have absolute immunity. The district court specifically found that they made a legislative decision based upon the budgetary needs of the city to switch from an outside IT vendor to go in-house with services. However, an appeal here is that the mayor who sent the council's decision to the vendor has been denied qualified immunity as well as the city administrator Mr. Pacetti and the water utility manager Mr. St. Peter who participated in the closed session before the Common Council and expressed their viewpoints on whether or not the contract should be terminated have all been denied qualified immunity. How is this case different from the Umber case? Well, I think it's different for a couple reasons. First of all, the Umber case only talks about as a protections of the First Amendment but it does not deal with the situation here where we have a contract that's terminable for any reason whatsoever where the underlying expression from Miss McAuliffe who is Comstas' owner is basically about an internal feud that she's having with her own employee as to whether or not he's surveilling her emails and communications and that case does not involve the situation here where these officials were not her employer. The governing body is the City Council. These fellows did not make the decision to terminate the contract. The irony in the plaintiff's case is that they're basically trying to use their own First Amendment rights to suppress through their claims of liability the voices of these three non-elected and non-decision makers in terms of what they thought about the ongoing. I have a question about whether there is any First Amendment claim here. I'm interested in the application of Garcetti against Sobolos to contracting cases. Umber and its companion case O'Hare Truck Service said that for purposes of the First Amendment contractors should be equated to employees and we know from Garcetti against Sobolos that firing an employee because of intra-employment speech doesn't violate the First Amendment. I notice you don't rely on Garcetti. Well I think Garcetti is passed over in the briefs but there is, Your Honor. So you might have forfeited any benefit from Garcetti. Well I don't know. I'm just asking you to discuss the issue. Well I think you make an appropriate and correct observation, Your Honor, because the court in Umber first of all said that independent contractors do not enjoy the same level of protection and that there must be a deferential weighing of the government's legitimate interests and must be judicially administered with sensitivity to governmental needs. And then years later when you have Garcetti, Garcetti has some parallels to what is going on here. The District Court did find that Ms. McAuliffe was approached by the Deputy Chief as part of an internal administrative review as to whether her was properly housing certain emails on the server. And she answered his questions. She sat on the computer next to him and showed him how the server worked and things like that. I think her expressions are no different than the individual in Garcetti for which the Supreme Court found that there was no First Amendment expression. I think you have the further issue in this case that the decision-making here involves the counsel making a decision to terminate the contract. The District Court found that the activity here challenged was basically the same activity as what occurred in the classic U.S. Supreme Court decision of Bogan. And there's no Supreme Court nor Seventh Circuit precedent that has said that the expression of non-employers, non-decision-makers must be muzzled. That is essentially what the Supreme Court is asking these three officials to do. To muzzle yourself. Don't say a thing. In your brief you focus on the fact that McAuliffe was speaking out against her own employee Kirkman, correct? Correct. But wasn't she also speaking out against Bassetti too? Well you have, that's what she alleges, but you have to look at the actual evidence. And when you look at the evidence in this case, I would urge you to look at record 78 and some of the stipulated facts, 145, 147, 148, and 153 to 154. There's not much there that actually triggers some of the First Amendment case law that they rely upon. They rely heavily upon these cases involving mere threats, but that case law is really problematic because, first of all, none of those cases involve the situation here where we have a contracted party whose contract can be terminated for any reason whatsoever. You know, I have to tell you, I am extremely well aware that the contracts were terminable by either party at any time for any reason, but surely you realize that any reason doesn't include an unlawful reason. You're not intending to imply that the city, I hope you're not intending to imply that the city could terminate the contracts because they did not like what McCall said about Bassetti's conspiracy with her own rogue employee. And we're not going that far, Your Honor. The issue before this court is the qualified immunity. You sure seem to. The issue before this court is the qualified decision-makers, the non-elected officials, who expressed their own viewpoints that the contract could be terminated. They expressed their own reasons for why they thought that the contract should be terminated. There was no case law in this circuit that required the city administrator and the mayor and the water utility manager to stand silent. In fact, when you look at some of the cases in this circuit, such as Judge Griesbach's decision in Therol, a case called Hutchins v. Clark from 2011, these cases indicate that the court should take a cautious approach when you have a non-decision-maker, non-elected official who's expressing their own viewpoints. And her allegations about what she thought Mr. Bassetti did or said to her really involve his own The whole point seems to be that Mr. Bassetti didn't like what she was saying about the potentially criminal wrongdoing of his friend Kirkman, and he decided to retaliate by bringing about the termination of her The City Council and the alderpersons are the only ones under the contract who could vote to terminate it. This circuit and the Supreme Court have never addressed this issue. You surely know about the cat's paw cases. If A tells B to do something, and B is the only person with authority to do it, and A is telling B to violate the law, can A be held liable on a cat's paw theory? The It's perfectly straightforward. You can't be meaning to deny all of those cases. That doctrine has been recognized by the Supreme Court. Well, Your Honor, that theory has not been addressed in the briefing. I know I'm not studied up on it, but it is recognized by the Supreme Court, and so your basic theme that somebody cannot be liable for telling the actual decision-maker to do something doesn't work. It's not a ground of qualified immunity. I think we need to go to the second argument, the second claim in this case, the Fourth Amendment claim. I have a factual question. Are you contending that the contract allowed the city to look at the contents of the plaintiff's emails? The contract, in this case, Your Honor, also involves the relationship with... The answer to my question is yes or no, and then you can explain why. Well, there is provision in the contract... The answer to my question is yes or no. Are you contending that there is a clause in the contract allowing them to access the emails? I don't know if it's expressly... I guess the answer is no, Your Honor. I do not believe there's a contract term that is so stated. There is a contract term, however, that does provide that all of the property and all of the services and programming that they were doing belonged to the city. If you are not making this contention, then you're not making it, and it's not before us on appeal. That means that the contention you are making is that this was a private search. On that question, the district judge said the evidence is too uncertain to allow that issue to be resolved on the current record. And at that point, this raises a question with Jones, we can't review factual disputes or we can't review records that are factually too uncertain to reach a decision. You have to wait for the final judgment. So, since you're not arguing the contract point, that leads to my question under Johnson against Jones. Why do we have appellate jurisdiction? You have appellate jurisdiction in this case because if you look at the cases like White v. Girardot, specifically at footnote 5. I'm asking you to discuss Johnson against Jones. It's a particular decision of the Supreme Court. I believe that that case and other cases still allow this court to look at stipulated facts, uncontested facts, and the like. And when we look at the stipulated facts, the admitted facts in this case, the district court's analysis on the qualified immunity under the Fourth Amendment was too quick in its conclusions and it flipped the burden on the city. Do you, in fact, have anything to say about Johnson against Jones? I have not, I have, I cannot bring the facts of that case to memory right now, Your Honor. I'm sorry. If you... Somebody who takes an interlocutory appeal has, I think, a special responsibility to be prepared to discuss why the Court of Appeals can decide this without waiting for a final decision in the district court. And I did look at that... We just heard this issue en banc a few months ago and your briefs don't discuss that either. Our initial brief was filed a year ago, Your Honor. I'm not aware of the current decision. Of course, if qualified immunity is not reviewable now, by the point we get to trial, the whole purposes of the protection of the qualified immunity is gone and the court has to look at the factual record at that time. I did review some of the case law in this circuit involving supplemental jurisdiction and I found a number of these cases... Counsel, I hope we're not talking by one another. This has nothing to do with supplemental jurisdiction. This has to do with an interlocutory appeal. And that's what I I'm sorry, Your Honor. And in looking at some of those cases, again, they said that you can look at a district court's assertions of factual disputes does not deprive a court of jurisdiction. Some of these cases also said that you may look at undisputed facts in the record, stipulated facts, and plaintiff's factual assertions. For those propositions, I point this court to Jones v. Clark and White v. Girardot, footnotes 5. Going back to your earlier question about the cat's paw, Your Honor, I think what is different, and again those cases aren't discussed here, but what is different is you may have one employee telling a supervisor who has the power to suspend or terminate another employee, but here these three officials did not have the power to contract. They could only go and express their opinions, whether good, bad, or indifferent, if they were critical of the investigation, if they were skeptical of Ms. McAuliffe's comments, what case law told them under the First Amendment that they had to muzzle themselves, and that they could not speak? Well, the plaintiffs say that Bosman met with alter persons ahead of the meeting to push for contract termination. Why isn't that enough to create liability for Bosman? I mean, why is facilitation of another's wrongful conduct not enough to create liability? And what do we make of St. Peter's admission that the termination came about because McAuliffe was putting the city in a bad light? It's pretty direct evidence that St. Peter was facilitating an action with a wrongful motive, isn't it? They were critical of the underlying investigation, sure, but again, what case law told them that they couldn't express those opinions? They're not the ones who can make the decision, and in fact, when you look at last year's decision from the U.S. Supreme Court in Ziegler v. Abbasi involving the 9-1-1 detainees, there's an interesting discussion in that case about the intersection between qualified immunity and the intercorporate conspiracy doctrine, which was raised in this case. These three officials, we expect our officials who are working together, you know, like a department heads, we expect them to discuss what is coming up on the agenda and to express their viewpoints, and the U.S. Supreme Court in the Ziegler case found that open discussion among the officers is to be encouraged, and you see that same type of theme in the Therrell case from Judge Griesbach that I mentioned earlier, Novoselsky, Mulligan, actually Mulligan I don't think is cited in the briefs, Mulligan v. Nichols, 835 Federal Third 983. Have you filed a rule 28 letter? No, I just discovered this case this morning, Your Honor. You can file it even on the day, and I think we have your position, Counsel. Thank you. Mr. Infusino. May it please the Court, Nicholas Infusino for the appellees. Your Honor, just to get right into this, the Umber case as it relates to the First Amendment is directly on point. Umber dealt with an independent contractor. I don't see how. There's no claim here that this contractor was fired because it The holding of Umber is that Elrod against Burns applies to independent contractors just like it applies to employees. Correct. That, of course, is what led to my question. If contractors are treated just like employees, then why aren't contractors subject to the rule of Garcetti against Sabalos that there is no First Amendment liability for penalizing or responding to intra workplace speech about what's going on in the job? Correct. And, Your Honor, we have to look at, then, the three sources of speech that constituted what the District Court found as public concern. One was Ms. McAuliffe's participation in the Deputy Chief Miss Skinner's investigation. That investigation was initiated by the Kenosha Police Department, and it was to look at the destruction of public records, the improper housing of police emails on city servers, and then also whether there was any surveillance being done by Mr. Kirkman of both municipal officials and Comstas officials. Ms. McAuliffe did not initiate that investigation itself. It was at that time that Mr. Pesetti, in March of 2014, came in and directly started threatening her contract for her participation in that investigation. So that's not just a intercompany dispute. Further, to get back into the history of the matter, the facts, is Pesetti informed Ms. McAuliffe in September of 2013, five months before that speech, before the threats were made, that he intended to hire Kirkman to be the director of IT for the city. So there is a nexus already between Mr. Pesetti and Mr. Kirkman that he was going to be director of IT, making him a quasi-public official at that point. Mr. Pesetti... What basis do you have to say he was a quasi-public official? He had informed both city staff, including the police department, and Ms. McAuliffe, that he was creating the director of IT position and he was going to hire Kirkman to fill that position. He then, as the record shows, he went through a series of events to go outside normal city protocol to create a IT position to put himself in charge of the hiring process outside of normal city procedures and ultimately hired him in May of 2014. So the theory of the case is that they were conspiring, he was acting as an agent of Pesetti, and that's the underlying basis of the Fourth Amendment claims all throughout that period. What's the plaintiff's best case law supporting an expectation of privacy and emails served on an employer's service server? Is the claim here that the emails were stored on the city server or that they simply pass through the city server? I mean, can you explain better this idea that the server was segmented? Was it password protected, for example? Correct. It was password protected and it is, under the contract, there were to be afforded dedicated data lines. So they were in fact stored on the city server, but it was supposed to be separate from the city systems itself, so they wouldn't be subject to open records requests and other aspects. The nature of the IT business that Compsys was under was such that they were operating on the city systems at all times. It was the most efficient to operate the email systems through the city systems in a segregated part of it. Well, why do you think Compsys and McAuliffe have a reasonable expectation of privacy in their emails on this server? Going back to the original contract, the original contract offered dedicated data lines. They were all password protected. That's why the search was done by an employee or the surveillance was done by an employee of Compsys, because city officials... But this was on a government server, correct? Correct. And if you follow the litany of cases, it's no email. If I put an envelope in the mail, it gets handled by government officials, gets stored in a government building, goes into... What would a postal service have to do with this? Do you have any cases that touch more specifically on emails? Sure. That's physical mail going from one place to another. Sure. And USB Forrester, the Ninth Circuit, determined that the privacy interests of physical mail and the privacy interests of email were equivalent. There's also USB Warshak, that there was an expectation of privacy in emails. That's a Sixth Circuit case. There's a USB Hamilton, Fourth Circuit emails, which determined that emails are in fact confidential. Were those emails on government servers though? And to get back to that point then, so if you take the physical mail... The nature of this question is, I believe Hillary Clinton found that she did not have an expectation of privacy in emails on the contract. Why is this different? Because the plaintiff in this case is an independent contractor with a contract that established an expectation of privacy within those emails by a dedicated ad office. What established the expectation of privacy? I asked your adversary whether there was a concrete claim of any waiver in a contract, and the answer seems to be no. The parallel question for you is whether there's anything in the contract that specifies that these would be held confidential. There are some such statutes. There's a statute, for example, specifying that personal data held on IRS computers is private, confidential, can't be shared or disclosed, even with the president. Was there anything like that in this contract? Correct. It was a contract provided for dedicated data lines for cons. I didn't ask whether it provided for confidentiality of the information. It did not specifically provide for confidentiality of information, but it also did not state that there is no reasonable expectation of privacy within those emails. Going back to the analysis, in Narducci v. Moore, the question was whether an employee, a public employee, using a government phone line had an expectation of privacy in the phone line, even though it was on the government's electronic systems. In that case, the Seventh Circuit found that yes, even though you're on a government phone line, CAT's still applied, it's an electronic system owned by the government, there's still an expectation of privacy within the use of the phone. In that case, the court also denied qualified immunity on the basis that the state of the law under CAT itself, which dealt with a public or with a private phone, not with the government phone, that in that case that was enough sufficient notice for the denied qualified immunity. So the fact that we're debating the issue whether or not a right of privacy exists under these facts, does that mean the law is not clearly established and Pacetti was or was not violating clearly established principles of law? No, and if you look at the standard is whether the totality of the law provided fair warning. So to believe to, for Pacetti to make the claim that he thought he had a reasonable, that it was not unlawful to go look at the emails, he would have to believe that using a mole employee of the plaintiffs to go surveil her emails for the purposes of taking confidential business information to construct an internal IT system and then eliminate the plaintiffs would be lawful, right? So he would have to believe that a form of court. We come back to the contract question. If that was a breach of contract, either a declaration of privacy in the contract or some prohibition, then there's a pretty strong position. If it's not, I don't see how it gets stronger by being restated as a constitutional claim. How much privacy there is in something held on public computers would normally be the subject of an agreement between the parties. Sure, but under Narducci there's no contract as well and they still found, even though it's on a government system, the court found that there's still an expectation of privacy within the workplace for employees. Is there any evidence in the record regarding whether Pichetti directed Kirkman to survey the email or whether Kirkman simply did so on his own initiative and then shared the material with Pichetti, which came first, in other words, Pichetti's encouragement or Kirkman's actions? We don't know how far back Kirkman's actions trace. We do know in 2013 he was surveilling emails at that point. The record does show that there were conversations of Pichetti looking to gain employment with the city back in July of 2013. In September of 2013, that's when Pichetti informed McAuliffe that he was going to be hiring Kirkman to be the director of IT. Pichetti admits the acknowledge of before hiring Kirkman for the position. So Pichetti admits to the 2014 investigation that Kirkman had done some things that he was not proud of. He also admitted in deposition testimony that prior to the hiring that Kirkman himself, he had a conversation with Kirkman about surveilling McAuliffe's emails. Not only that, Pichetti then acquiesced to the searches itself when he hired him to be the director of IT. Pichetti and the city then benefited by his knowledge that he gleaned unlawfully by putting him in that position and then the internal IT department. Pichetti went to enormous efforts to go and protect Kirkman by trying to shut down the Ms. Guinness investigation by threatening both McAuliffe and Deputy Chief Ms. Guinness to shut it down and by threatening McAuliffe that if she were to file a criminal action in this case that it would lead to the termination of her contract. And again he ultimately rewarded Kirkman for the surveillance by giving him the job as director of IT. So there's a lot to tie together with the conspiracy that it was taking place back while Kirkman was in fact surveilling. Going back into the First Amendment claim in Garcetti, I believe there's ample case law that supports these types of speech being on speech of public concern. There's Valentino versus Village of South Chicago Heights where a employee was complaining about public corruption was terminated and the court found that the public corruption complaint was sufficient to qualify. Also Spigaglia v. Hall where an employee was complaining about misconduct of other employees and it was deemed to have qualified. Was that pre or post Sabalos? I ask that because in Sabalos itself the speech was a contention that fellow employees had committed crimes. I don't know that answer your honor. This was a 2004 case. Pardon? Spigaglia was a 2004 case. That's before Garcetti against Sabalos. I'm sorry. The Valentino case. You can't distinguish Garcetti against Sabalos on the ground that here there was a potential complaint that somebody had committed a crime. That's the core of Garcetti. Sure but then the threat that if she were to file a criminal complaint that one definitely does rise to the level of protected First Amendment speech. Sabalos was a prosecutor. He recommended the filing of a criminal complaint and was fired when he persisted in that recommendation. Sure but to to make a threat to keep somebody from actually going and filing the complaint itself. That's exactly what happened in Garcetti against Sabalos. You can't distinguish that case by pointing to something that was involved in that Sure. The her speech then as it relates to corruption across the board though the speech itself was a matter of public concern because she wasn't only complaining about her interest she was complaining about other the city's interests, other municipal officials interests, destruction of public records when she participated in that initial investigation, the Miskindus Is verbally deriding someone enough to make out a claim for retaliation or are you simply claiming that this was one of many things? We're saying it's the combination of all the things. So the verbally deriding and then the threats. Judge Easterbrook and Fairleigh v. Andrews you give a good explanation as how threats can have the same effect as a punishment itself because it's prior restraint at that point. So Fairleigh v. Andrews is a DeGiuseppe versus Village of Bellwood which the court determined that petty harassment itself can equal punishment. But pulling back it's not just the threats and the harassment is then culminated in the actual termination of the contract. Cassetti then joins with St. Peter and Bosman to have meetings with Alderman to see the termination, to cut off plaintiff's access to the computer systems prior to the meeting for the termination, participating in the closed session meetings itself to see the termination itself. So the cat's paws analysis would apply in that respect. And as stated we ask that you affirm. Thank you very much counsel. Thank you. The case will be taken under advisement. The case is adjourned.